Ivan Torres
itorres@cahill.com
Edward N. Moss (pro hac forthcoming)
emoss@cahill.com
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, N.Y. 10005
(212) 701-3000

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALTENAR TECHNOLOGIES LIMITED,<br>First Floor, Cycle 360 House<br>Isle of Man Business Park,<br>Douglas, Isle of Man, IM2 2QZ<br><br>      Plaintiff,<br><br>   v.<br><br>SPORTRADAR GROUP AG and<br>SPORTRADAR AG,<br>Feldlistrasse 2 9000<br>St. Gallen, Switzerland.<br><br>      Defendants. | Civil Action No. 2:26-cv-3443 |

**COMPLAINT**

Plaintiff, Altenar Technologies Limited ("Altenar"), brings this action against Defendants,

Sportradar Group AG and Sportradar AG (collectively referred to in several instances as

"Sportradar" for reasons discussed in more detail below), and alleges as follows:

**NATURE OF THE ACTION**

1.  This is an action under the federal antitrust laws to stop Sportradar from abusing its

exclusive control over the upstream United States markets for live official sports league data—***the***

essential input for businesses like Altenar that sell turnkey sports betting technology platforms to online sportsbooks—in order to exclude Altenar from, and thus foreclose competition in, the downstream United States market for turnkey sports betting platforms.

2.      Sports betting is a huge and rapidly growing industry in the United States. Customers in this country placed over $165 billion in bets in 2025.[1]  While sportsbook industry giants like DraftKings and FanDuel use their own online betting technology platforms, many other customer-facing brands that offer sports betting to customers purchase turnkey sports betting technology platforms from third-party, business-to-business suppliers like Altenar.

3.      Altenar has one of the premier turnkey platforms in the world.  Indeed, it competes effectively abroad, but it has been foreclosed entirely from entering the United States market by Sportradar's abuse of its monopoly power over the critical input for Altenar's product—live official league sports data.

4.      Increasingly, the most important, and most lucrative, business for sportsbooks is "in-play" betting—wagering during the game based on events that are unfolding in real time. Indeed, sportsbooks *must* offer "in-play" betting to remain competitive, and the only way they can do so is by incorporating "official league data"—the fastest and most reliable data, which is officially sponsored by each league—into their platforms.  Thus, to offer a competitive platform to sportsbooks, Altenar must have access to this official league data, which it rapidly integrates into its turnkey product—for example, into its odds-setting and display technologies.  In other words, *live official data is the essential facility for Altenar*; sportsbooks need to have it, which

---

[1] Bill King, *Sports betting handle grows almost 11% in 2025 to over $165 billion*, Sports Business Journal (Feb. 6, 2026), https://tinyurl.com/2zuc9srn.

means that turnkey technology providers must also have it to compete effectively (*i.e.*, to be able to sell their product to sportsbooks).

5.      Two industry giants—Sportradar and Genius Sports—have effectively cornered the market on official sports league data.  Operating as a duopoly,[2]  each of Sportradar and Genius Sports has entered into contracts that give it *exclusive* access (*i.e.*, monopoly power) over certain of the major sports' official data.  Sportradar dominates the field, particularly with respect to the largest United States-based sports leagues: it has exclusive multi-year arrangements with the National Basketball Association (NBA), the National Hockey League (NHL), and Major League Baseball (MLB).  Genius Sports, for its part, has its own exclusive deal with the highly coveted National Football League (NFL).

6.      For many years, Sportradar has provided Altenar with access to its official league data rights for use with Altenar's turnkey product in developed betting markets abroad—often on onerous terms—at a significant profit to Sportradar (as evidenced by payments to it from Altenar of over $6 million per year).  With access to this critical input, Altenar has had great success in selling its turnkey product to sportsbooks abroad.  Indeed, outside of the United States, there has historically been healthy competition in the turnkey technology market.  Numerous companies— including Altenar—compete for business from sportsbooks, and the result has been increased innovation and competitive pricing.

7.      The market for turnkey technology services, however, has developed quite differently in the United States.  In 2018, in response to a challenge led by New Jersey, the

---

[2] Genius Sports' CEO Mark Locke has spoken publicly about the "duopolistic nature" of the data market. *See* Martin Ross, *Genius CEO: Tech spend 'transforming' rights deals*, SportsBusiness.com (Aug. 6, 2025), https://tinyurl.com/ydznkyem.

Supreme Court struck down the federal prohibition on gambling in *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018). At that time, it became clear that sports betting would quickly develop into big business in the United States, including in New Jersey. As a result, Altenar began making plans—and later took affirmative steps—to offer its turnkey product in the United States. The key to entry, of course, was obtaining the United States rights to official league data, and so Altenar began requesting those rights from the company that controlled most of them—its longstanding business partner, Sportradar.

8.      At the time of and after *Murphy*, Sportradar and Altenar were operating under a 2015 agreement that covered rights abroad. In 2020, the parties began discussing a renewal, and Altenar asked for rights to cover the United States. Sportradar pushed for an agreement that expressly excluded the United States but promised Altenar that, if Altenar signed the proposed agreement—which also imposed heightened pricing, provided Sportradar with critical information about Altenar's customers, and unreasonably forced Altenar to purchase Sportradar technology products it did not want and would never use—Sportradar would grant Altenar access to the United States rights under a separate commercial deal. Given its need for the data to run its business abroad, Altenar had no choice but to agree to Sportradar's onerous terms. And when it signed that new agreement in 2021, Altenar took Sportradar at its word—in light of the parties' longstanding course of dealing—that Sportradar would make good on its promise to supply Altenar official league data for use in the United States.

9.      But after it had the favorable 2021 contract in place, Sportradar reneged on its promise to supply Altenar with official data for use in connection with betting in the United States. The reason for Sportradar's about-face has become crystal-clear: Sportradar wanted to take as much of the United States turnkey market for itself as it could. Rather than keep its promise to

provide Altenar with data rights for use in the United States—as it had done through the parties' longstanding course of dealing abroad—Sportradar instead decided to choke off Altenar's access to the lifeblood of its business and attempt to capture market share for its own turnkey product.

10.    Indeed, in June 2022, with the favorable deal with Altenar securely in place, Sportradar announced the launch of ORAKO, "an ***all-in-one*** sportsbook solution for betting operators" that Sportradar touted would "***alleviate [sportsbooks'] need to invest*** in additional technology and innovation . . ."[3]  In other words, sportsbooks would not need to buy technology from other competitors like Altenar—or to innovate at all—because they could just purchase everything from Sportradar.

11.    Not only has Sportradar prevented Altenar from entering the United States market, but it is also trying to remove Altenar as a competitor abroad.  The parties' 2021 agreement expires on March 31, 2026, and Sportradar has refused to negotiate anything remotely reasonable or in compliance with other countries' competition laws.  For example, Sportradar's "offer" to extend the parties' commercial deal contained a long list of one-sided terms, including unreasonable pricing and unwanted products, which would have resulted in a loss-making operation for Altenar. In essence, Altenar had to choose between operating at a loss or losing access to its essential data supply from Sportradar and being foreclosed from the turnkey market altogether.  As a result of Sportradar's anticompetitive conduct abroad, Altenar was forced to file an arbitration, which is currently ongoing in Switzerland, as well as a complaint with the Maltese Competition Authority.

12.    This is not the first time Sportradar has been accused of using its exclusive access to official league data to harm a competitor in a separate, technology-based market.  In *Sportscastr*

---

[3] Press Release, Sportradar, *Sportradar's all-in-one ORAKO sportsbook solution to drive higher operational efficiencies for betting operators* (June 27, 2022), https://tinyurl.com/2zbpfuy5.

*Inc.* v. *Sportradar Grp., AG,* No. 2:23-CV-00472-JRG (E.D. Tex. 2023), Sportradar was accused by Sportscastr d/b/a/ PANDA of using its exclusive control over official league data to force sportsbooks to buy Sportradar's streaming technology, which allegedly foreclosed PANDA's competing (and allegedly superior) technology from emerging. PANDA argued in its publicly available summary judgment opposition that "Sportradar would retaliate against any customer that tried to develop its own competitive technologies by denying them access to data" and that "[i]t did so to sell its inferior technology to sportsbooks."[4] That is precisely what Altenar alleges here. According to public records, Sportradar settled the PANDA lawsuit before trial.

13.    The behavior of Genius Sports further demonstrates that Sportradar is refusing to supply Altenar with data for an anticompetitive reason. Like Sportradar, Genius Sports historically has supplied Altenar with official league data for the leagues Sportradar does not exclusively control, such as the NFL. But unlike Sportradar, Genius has ***not*** cut Altenar off abroad, and it has never suggested that it would refuse to supply Altenar in the United States. Nor has Genius imposed excessive pricing or forced a bundle of unwanted products on Altenar. The key difference? ***While Sportradar now competes directly with Altenar by providing an all-in-one turnkey sportsbook solution, Genius does not.***

14.    Sportradar should not be permitted to do an about-face and change its longstanding course of dealing with Altenar (and to renege on its promise) to prevent Altenar from entering— and competing effectively in—the United States market. If Sportradar does not supply the essential facility of its official live data to Altenar, Sportradar will gobble up share in the turnkey

---

[4] Plaintiff's Amended Opposition to Sportradar's Motion for Summary Judgment On Plaintiff's Antitrust Claims at ¶ 31, *Sportscastr Inc.* v. *Sportradar Grp., AG,* No. 2:23-CV-00472-JRG (E.D. Tex. 2023), ECF No. 536.   SPORTRADAR GROUP AG

market in the United States, since sportsbooks cannot operate without the official league data to which Sportradar is the gatekeeper.  Indeed, with its "must have" data rights locked in, Sportradar can name its price and its conditions when it "negotiates" with sportsbooks in the United States regarding its turnkey offerings.  This lack of competition can only result in decreased customer choice, increased prices, and decreased innovation.  As Sportradar itself proclaimed, with the arrival of ORAKO, sportsbooks will never need "to invest in additional technology and innovation."  Moreover, with a stranglehold on the data—and its anticompetitive misuse of that data to harm competition in other markets—Sportradar itself has little to no incentive to innovate and little price competition.

15.    The United States market for turnkey sports betting technology platforms should develop just like the markets for those platforms abroad—with free and robust competition.  Sportradar's refusal to provide its official league data to Altenar is an about-face from the parties' longstanding course of dealing, which cuts off Altenar's hope of competing in the United States.  Indeed, because of Sportradar's refusal to continue to supply Altenar, despite devoting significant resources to calling on United States customers, Altenar has been completely foreclosed from the market.  That is true even though Altenar has a superior turnkey product that customers love.  The antitrust laws are specifically designed to prevent precisely this type of anticompetitive outcome.

16.    For these and the reasons set forth in more detail below, Altenar brings this civil antitrust action to enjoin and remedy Sportradar's exclusionary scheme to acquire, maintain, and misuse monopoly power over live official league sports data in order to foreclose competition in the downstream turnkey technology market through its refusal to deal and denial of access to essential facilities that are necessary for Altenar to compete.

**PARTIES, JURISDICTION, AND VENUE**

*The Parties*

17.     Plaintiff Altenar is an Isle of Man business-to-business ("B2B") sportsbook software provider that offers turnkey technology platforms to sportsbooks.  Altenar has historically been supplied with live official league data by Defendant Sportradar Group AG, acting through Defendant Sportradar AG.  Altenar's headquarters is located at Cycle 360 House, Douglas, Isle of Man IM2 2QZ.

18.     Defendant Sportradar Group AG is a sports data and technology holding company based in Switzerland that, among other things, and through its corporate affiliates, licenses exclusive live data feeds for professional sports and distributes such data to sportsbooks and software providers in the United States and abroad.  Sportradar Group AG also markets a competing turnkey technology platform to sportsbooks.  Sportradar Group AG's headquarters is located at Feldlistrasse 2 9000, St. Gallen, Switzerland.

19.     Defendant Sportradar AG is the primary operating entity of Sportradar Group AG.  Sportradar Group AG is a sports data and technology operating company also based in Switzerland that, among other things, and through its corporate affiliates, licenses exclusive live data feeds for professional sports and distributes such data to sportsbooks and software providers in the United States and abroad.  Sportradar AG also markets a competing turnkey technology platform to sportsbooks.  Sportradar AG's headquarters is also located at Feldlistrasse 2 9000, St. Gallen, Switzerland.

*Subject Matter Jurisdiction*

20.    This Court has subject matter jurisdiction over this dispute under 28 U.S.C. §§ 1331 and 1337, and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, because Altenar seeks damages and injunctive relief for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

21.    The Court has subject matter jurisdiction over this dispute because it involves conduct that restrains or substantially affects interstate commerce.

22.    More specifically, as set forth herein, Defendants Sportradar Group AG and Sportradar AG have refused Altenar facilities essential to compete for anticompetitive purposes, harming consumers and markets at large in the United States.

*Personal Jurisdiction and Venue*

23.    This Court has personal jurisdiction over Defendants Sportradar Group AG and Sportradar AG and venue is proper in this District because, among other reasons, Section 12 of the Clayton Act, 15 U.S.C. § 22, acts as a specialized personal jurisdiction and venue provision, allowing corporate antitrust defendants who conduct business in the United States to be sued in any district where they are an inhabitant, found, or "transact business."  Section 12 authorizes nationwide or worldwide service of process, which has been interpreted by courts to mean nationwide jurisdiction over any defendant that has sufficient contacts with the United States as a whole.  Personal jurisdiction under Section 12 is satisfied here because the Defendants have purposefully availed themselves of United States markets, they have suit-specific contacts with the United States, and exercising jurisdiction comports with fair play and substantial justice.

24.    Defendants Sportradar Group AG and Sportradar AG have both purposefully availed themselves of the privilege of conducting business within the United States as a whole. Defendant Sportradar Group AG is publicly traded on the NASDAQ under the symbol SRAD.

Defendant Sportradar Group AG publicly reported $1.5 billion in full-year revenue for 2025, with approximately $376.6 million of that revenue derived from operations within and throughout the United States. Defendant Sportradar Group AG identifies Defendant Sportradar AG as its primary operating entity, including its United States operations. Sportradar Group AG and Sportradar AG direct, control, and materially participate in United States commercialization strategies, product approvals, compliance policies, and contracting that place Sportradar's products and services into the United States. Defendants do business with and contract with the largest sports leagues in the United States, including the NBA, MLB, and NHL, as well as the largest sportsbooks in the United States, including DraftKings and FanDuel.

25. Defendants have suit-specific contacts with the United States because Altenar has repeatedly requested necessary data rights from them for use in the United States, and Defendants have repeatedly refused to deal and denied Altenar facilities necessary to operate in the United States. Sportradar promised Altenar that it would provide Altenar with the data necessary to operate in the United States and then reneged on that promise and refused to deal with Altenar. The claims in this lawsuit arise from Sportradar's conduct directed towards the United States markets, and the anticompetitive effects of that misconduct are felt in United States markets. Notably, both Sportradar AG and Sportradar Group AG have refused data rights to Altenar. Indeed, "Sportradar" has collectively refused Altenar data rights to keep it out of the United States and New Jersey in particular, writing to Altenar at varying times as both Sportradar AG and Sportradar Group AG, with no explanation of why a response is made by any particular "Sportradar" entity or entities.

26. Exercising personal jurisdiction over Defendants comports with fair play and substantial justice. Their conduct substantially affects interstate commerce in the United States

sports betting markets.  The burden on these sophisticated multinational entities is modest relative to their deliberate exploitation of regulated markets and revenue streams in the United States. Given the extent of their business in the United States, and the hundreds of millions of dollars they generate from United States operations, these Defendants certainly can expect to be hailed into court in this country (as they have in at least one other antitrust case).

27.   In addition, this Court has personal jurisdiction over the Defendants because New Jersey's long arm statute permits the exercise of jurisdiction to the fullest extent allowed by the United States Constitution.  Personal jurisdiction under New Jersey's long-arm statute is satisfied here because the Defendants have purposefully availed themselves of New Jersey markets, they have suit-specific contacts with New Jersey, and exercising jurisdiction in New Jersey comports with fair play and substantial justice.

28.   Defendants Sportradar Group AG and Sportradar AG, a company registered to do business in New Jersey by the New Jersey Division of Revenue & Enterprise Services, have both purposefully availed themselves of the privilege of conducting business specifically within New Jersey.  Defendant Sportradar Group AG and Sportradar AG, acting directly and through their controlled United States affiliates and agents, have continuously and deliberately developed, supplied, licensed, supported, and profited from data, technology, and related services that are deployed to and used by licensed sportsbook operators, media companies, and other counterparties in New Jersey, and they have both knowingly engaged with New Jersey's pervasively regulated sports wagering and gaming markets, including by participating in, directing, or benefiting from licensing and compliance processes that are a prerequisite to offering their products and services to New Jersey counterparties.  Defendants Sportradar Group AG and Sportradar AG have derived substantial revenue from New Jersey and from interstate commerce that includes New Jersey, and

11

they have created continuing obligations with New Jersey-based customers and licensees. Defendants do business with and partner with sports leagues that have teams that operate out of New Jersey, including the New York Giants, New York Jets, and New Jersey Devils.

29.    Defendants have suit-specific contacts with New Jersey because Altenar has repeatedly requested necessary data rights from them for use in the United States, specifically directed at and through New Jersey, and Defendants have repeatedly refused to deal and denied Altenar facilities necessary to operate in New Jersey.  Defendants' refusal to deal is directed at New Jersey and the effects on consumers and the market at large is felt in New Jersey, where Altenar has tried to do business but failed because of Sportradar's antitrust violations.

30.    Exercising personal jurisdiction over Defendants comports with fair play and substantial justice.  Their conduct substantially affects commerce in New Jersey.  The burden on these sophisticated multinational entities is modest relative to their deliberate exploitation of regulated markets and revenue streams in New Jersey.  New Jersey has a manifest interest in adjudicating disputes arising from conduct that affects its licensees, consumers, and markets. Altenar has a strong interest in obtaining convenient and effective relief, and the efficient resolution of this controversy favors a single forum where the relevant commercial conduct occurred and where key witnesses and evidence—including New Jersey licensees, regulatory materials, and deployment records—are located.  Defendants conduct business in and directed to New Jersey, and they can reasonably expect being sued in this jurisdiction.

31.    In the alternative, to the extent Sportradar Group AG and/or Sportradar AG contest state specific contacts, personal jurisdiction is proper under Federal Rule of Civil Procedure 4(k)(2) for Plaintiff's federal antitrust claims because the Defendants have extensive, purposeful

contacts with the United States as a whole and exercising jurisdiction is consistent with due process.

32.     Also in the alternative, Defendants Sportradar Group AG and Sportradar AG are subject to personal jurisdiction based on agency, alter ego, and single enterprise principles. Defendants Sportradar Group AG and Sportradar AG hold themselves out as a single operating entity under the name "Sportradar."  This complaint accordingly refers to Sportradar Group AG and Sportradar AG collectively as Sportradar in many instances because, among other things, Defendants themselves use this term interchangeably.  These entities share branding, policies, technology, and overlapping officers and directors, and operate through intercompany agreements that allocate functions across affiliates while centralizing control over strategy, compliance, and product deployment.  United States affiliates act as agents carrying out Defendants Sportradar Group AG and Sportradar AG's directives in New Jersey, including engaging with New Jersey licensees and regulators to deliver Sportradar's products and services into the State.  According to its own website, "Sportradar" transacts business with New Jersey entities (and would-be customers of Altenar but for Sportradar's conduct) William Hill New Jersey and Sugar House NJ.  Further, Sportradar Solutions LLC is a corporate affiliate under the "Sportradar" brand that has a gaming license in New Jersey.  Defendants Sportradar Group AG and Sportradar AG exercise such control over their affiliates' New Jersey facing conduct that those affiliates' forum contacts should be imputed to Defendants Sportradar Group AG and Sportradar AG for jurisdictional purposes.

33.     In addition to the foregoing, venue is proper in this District under 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391 because Sportradar transacts business in this District and a substantial part of the events or effects giving rise to the claims occurred in and were directed at the United States, including this District.  Altenar's licensing and market entry efforts were directed through

New Jersey, and Sportradar's conduct was intended to, and did, foreclose Altenar's United States operations, specifically including this District.

## FACTUAL BACKGROUND

34.    The relevant factual background supporting Altenar's claims against Sportradar are set forth below. The primary matters that give rise to Altenar's claims are: (i) the rapid rise of sports betting in the United States; (ii) the critical importance of live official league data to sports betting in the United States; (iii) Sportradar's seizure of monopoly or at least market power over live official league data markets in the United States; (iv) Altenar's need to have access to Sportradar's data rights in a commercial deal (as the parties have previously done through a longstanding course of dealing abroad) to enter and compete in the downstream turnkey technology platform market in the United States; (v) Sportradar's anticompetitive decision to cut off that longstanding course of dealing and deny data access to Altenar, so that Sportradar can seize the United States turnkey technology market for itself; and (vi) the harm that Sportradar's refusal to deal and denial of essential facilities has caused in the United States market for turnkey sports betting technology platforms to United States consumers and the market at large.

### *The Rapid Rise of Sports Betting in the United States*

35.    Sports betting is the act of wagering on the outcome of sporting events and the performance of players within those events.

36.    For decades, sports betting was effectively outlawed throughout the United States, except for in discrete locations like Las Vegas, by the Professional and Amateur Sports Protection Act of 1992 ("PASPA").

37.    In 2018, however, the entire industry changed when the Supreme Court repealed PASPA in its *Murphy* decision.  After *Murphy*, individual states quickly began passing legislation

14

to allow sports betting with a license.  As of 2026, 39 states (and Washington D.C.) allow some form of legal sports betting.[5]

38.    In the United States, sportsbooks, the companies that take bets and pay out successful ones, have quickly developed from a $400 million business in 2018 to a $16 billion business in 2025.[6]

39.    The sports betting industry generates substantial economic value throughout the United States in terms of tax revenues, employment, and related services.  State governments rely on betting taxes and licensing fees as significant revenue sources, while the industry supports thousands of jobs across data provision, software development, marketing, and compliance functions.  Thus, the integrity of competitive sports betting and related markets is of considerable public interest.

40.    New Jersey has a particularly strong interest in the integrity of sports betting and related markets.  New Jersey spearheaded the effort to overturn PASPA, and it currently oversees a heavily regulated market in which sportsbooks and sportsbook vendors, including technology providers, operate pursuant to New Jersey state licenses, provided they meet certain requirements. The critical importance of sports betting markets to New Jersey is highlighted by the fact that in

---

[5]    *State of Play*, American Gaming Association (last visited Mar. 25, 2026), https://www.americangaming.org/research/state-of-play-map/.

[6] *See* Marcus Lu, *Visualizing the Growth of U.S. Sports Betting*, visualcapitalist.com (Jul. 5, 2024), https://www.visualcapitalist.com/visualizing-the-growth-of-u-s-sports-betting/;  Shwetha  Surendran, *Sports betting hits record $16.96 billion in revenue in 2025*, ESPN (Feb. 26, 2025), https://www.espn.com/espn/betting/story/_/id/48045855/sports-betting-hits-record-1696-billion-revenue-2025.  Customers in this country placed over $165 billion in bets in 2025.  Bill King, *Sports betting handle grows almost 11% in 2025 to over $165 billion*, Sports Business Journal (Feb. 6, 2026), https://tinyurl.com/2zuc9srn.

2025 alone, sports bettors in New Jersey accounted for approximately $12 billion in total sports bets placed (commonly referred to as "handle").[7]

### The Critical Importance of Live Official League Data to Sports Betting

41.     As the sports betting industry rapidly takes off in the United States and in New Jersey, it has become increasingly clear how essential timely and accurate live official data from sporting events—that is, real time and reliable information about what is happening—is to the industry at large. ***This data is the fundamental and essential raw material of sports betting.***

42.     The importance of timely and accurate live data is only growing as sportsbooks operate in an increasingly virtual online world where the vast majority of bets are placed through smartphone applications and bets may be placed virtually instantaneously.  As of 2026, over 90% of sports bets in the United States are placed online.[8]

43.     Further, the majority of bets placed in the United States occur after a sporting event has already started.  Such bets can, and do, involve outcomes that may occur in a sporting event within mere seconds.  Bets placed during a live game or match are referred to as "in play" bets. The importance of live "in play" bets, in terms of revenue, continues to grow in the United States. In an interview conducted in February of 2026, Sportradar VP Erich Zack stated that "live wagers account for as much as 75% of total handle. . . ."[9]

---

[7] Brad Senkiw, *New Jersey Sportsbooks Generate $1B in December Handle, $12B in 2025*, covers.com (Jan. 19, 2026), https://www.covers.com/industry/new-jersey-sportsbooks-generate-1b-in-december-handle-and-12b-in-2025-jan-19-2026.

[8] Isaac Rose-Berman, *The rise of sports betting is a growing public health crisis*, Stat News (Nov. 11, 2025), https://tinyurl.com/275r44cw.

[9] Erik Gibbs, *Sportradar VP Erich Zach: US in-play betting growth hinges on maturity, not regulation*, next.io (Feb. 23, 2026), https://next.io/news/features/sportradar-vp-us-in-play-betting-maturity-not-regulation/.

44.     Given the rapid rise of instantaneous "in play" bets, sportsbooks in the United States rely on and demand timely and accurate sports data to generate betting odds for the various outcomes consumers may wager on. Without fast, reliable data, sportsbooks cannot price bets accurately, manage risk effectively, prevent "sharp" bettors from taking advantage of information delays, or offer competitive betting products to consumers.

45.     In addition to data that is "fast," sportsbooks in the United States also rely on and demand data that is reliable. Official league data is effectively "blessed" by the governing bodies of their respective sports league as reliable. Whereas non-official data sources may come to different conclusions about the performance of a player in a sporting event—*e.g.*, whether an NBA player has achieved 8 or 9 rebounds in a game—official league data conclusively establishes that result, reducing or eliminating disputes sportsbooks may have with their bettors.

46.     Live, fast (low-latency) official league data is absolutely essential for sportsbooks to stay competitive. If a sportsbook attempted to utilize higher-latency or non-official data, bettors could take advantage of latency and reliability issues associated with such data. Moreover, certain states legally *prohibit* sportsbooks from relying on data other than low-latency official league data.

### Sportradar Secures a Monopoly Over Live Official League Data for "Must Have" United States Sports

47.     *The first relevant markets involve official league data.* There are separate markets for NBA, NHL, and MLB live official league data. Sportradar has durable monopoly power, or at least market power, through exclusive deals in each of these markets.

48.     Indeed, Sportradar has pursued a strategy of signing long-term contracts with major sports leagues under which Sportradar becomes the exclusive provider of official league data for betting purposes in exchange for paying huge sums of money to the leagues.

17

49.    Sportradar exclusively controls or has controlled low-latency official league data rights for, among others, the NBA, MLB, and the NHL.

50.    Sportradar's exclusive deals have come at a steep price.  For example, the latest Sportradar-NBA data deal, an eight-year partnership that began with the 2023-24 season, reportedly cost Sportradar more than $1 billion in cash and equity.[10]  The latest Sportradar-NHL data deal, a 10-year exclusive global partnership that began in June 2021, reportedly cost Sportradar an additional $250 million.[11]  The latest Sportradar-MLB data deal, announced in February 2025 to run through 2032, reportedly required Sportradar to pay annual license fees in addition to giving MLB an equity stake of up to 1,855,724 Class A ordinary shares in Sportradar.[12]

51.    Sportradar's data costs are increasing.  For example, in its public filings, Sportradar has reported that in just one year (2023 to 2024), its "sports rights expenses" have increased 64.5%.[13]

52.    Sportradar spends these amounts because each exclusive license gives it an effective and durable monopoly over the market in the supply of each league's official data.  From the perspective of a sportsbook, one league's data is not a substitute for another league's data, nor is unofficial data a substitute for official data.  Thus, ***Sportradar has monopoly power (and***

---

[10] Eben Novy-Williams, *NBA Grabs 3% of Data Giant Sportradar in New Eight-Year Deal*, Sportico (Nov. 17, 2021), www.sportico.com/business/sports-betting/2021/nba-sportradar-data-equity-1234646790/.

[11] Eben Novy-Williams, NHL, *Sportradar Finalize 10-Year Global Data Partnership*, Sportico (June 28, 2021), www.sportico.com/leagues/hockey/2021/nhl-sportradar-partnership-1234632990/#.

[12] Press Release, Sportradar, Major League Baseball and Sportradar Announce Expanded, Exclusive Partnership Through 2032 (Feb. 7, 2025), https://investors.sportradar.com/news-releases/news-release-details/major-league-baseball-and-sportradar-announce-expanded-exclusive#.

[13] *Sportradar Group AG 2024 Annual Report* at 70, Sportradar (Mar. 24, 2025), https://investors.sportradar.com/static-files/346a82eb-7978-4aa9-b462-9c3feea4724a.

*certainly market power) in the markets for official league data.*  And by virtue of its agreements with so many of the most important leagues, Sportradar would have market power even if one were to consider official data for all major sports as one market (which it is not).  (Indeed, as noted above, Genius Sports' CEO publicly has spoken about the "duopolistic" nature of the sports-wide data business, which is dominated by Sportradar and Genius Sports.)

53.     In the United States, the major sports leagues and their data partners enforce their exclusive arrangements with official distributors by, among other things, removing unauthorized data collectors from venues, thereby further eliminating unofficial data sources as a viable option for sportsbooks.  Thus, even if sportsbooks theoretically wanted to rely on unofficial league data sources, which, in reality, they cannot and do not do, they have been prevented from doing so by the leagues and their data partners such as Sportradar, as well as gaming regulators.  The exclusivity effects in data markets are further strengthened by Sportradar establishing close economic ties with the leagues.

54.     Indeed, exclusive multi-year deals like those described above make it *impossible* for sportsbooks to operate without Sportradar-controlled data rights.  For example, if a United States sportsbook wants to offer betting on NHL games (and all sportsbooks must offer all major sports to be competitive), it can *only* get the official NHL data it must have from or through Sportradar.

55.     Sportradar openly admits that sportsbooks must have access to its official league data rights to compete.  Sportradar's website touts that "[t]he gaming industry relies on: the Sportradar Live Data Service."[14] Sportradar similarly proclaims that *"[a] sportsbook lives or dies*

---

[14]  *Live Data*, sportradar.com (last visited Mar. 25, 2026),  https://sportradar.com/betting-gaming/betting/sports-data/?lang=en-us.

*on data. To cover a multitude of sports and markets, the data you use has to be accurate, rapid, secure and plentiful. That's exactly what you get with us."*[15]   Further, in an Investor Day Memorandum provided on April 1, 2025, Sportradar proudly emphasizes that it has "major sports rights secured for the long-term" as a competitive advantage and a key element of its growth strategy.[16]   Thus, as Sportradar itself concedes, because of Sportradar's exclusive rights to official league data, sportsbooks simply need Sportradar to survive.

56.     In public filings, Sportradar identifies that any future failure to hold onto exclusive data arrangements with sports leagues would undermine its competitive advantage and constitute a risk to its business.  Sportradar states: "We rely on strategic relationships with sports leagues and federations globally for data and statistics fundamental to our products and services.  These long-term relationships provide us with a competitive advantage in distributing accurate and fast data feeds to our clients and in certain jurisdictions, the legal requirement to only use official data increases our reliance on such sports league partners."[17]

57.     Sportradar is far from alone in its assessment that exclusive official data rights provide it with extraordinary power over sports betting-related markets.  For example, in public filings in the PANDA litigation referenced above, a sports betting expert explained that access to Sportradar's official data rights "is the *only* means by which a sportsbook can reliably offer the most lucrative form of sports betting."[18]

---

[15] *Id.*

[16]  Press Release, Sportradar, Sportradar Outlines Growth Strategy and Financial Outlook at Investor Day (Apr. 1, 2025), https://investors.sportradar.com/news-releases/news-release-details/sportradar-outlines-growth-strategy-and-financial-outlook.

[17]  *Sportradar Group AG 2024 Annual Report* at 9, Sportradar (Mar. 24, 2025), https://investors.sportradar.com/static-files/346a82eb-7978-4aa9-b462-9c3feea4724a

[18] Plaintiff's Amended Opposition to Sportradar's Motion for Summary Judgment On Plaintiff's Antitrust

*The Turnkey Technology Market and Its Reliance on Live Official League Data from Sportradar*

58.    ***The second relevant market, downstream from the data markets, involves turnkey technology platforms.*** Outside of the few sportsbooks large enough to develop their own technology solutions, sportsbooks purchase turnkey technology platforms from providers such as Altenar (and more recently Sportradar) to power their sportsbooks. Turnkey technology providers combine live official league data with technology and software solutions to generate odds and provide a user interface for use by sportsbook customers. NBA, NHL, and MLB official league data are each individually—and certainly collectively—an essential input for a turnkey technology platform company. By refusing to provide Altenar with access to official league data for the NBA, NHL, and MLB, Sportradar is attempting to use monopoly power in the markets for official league data to stifle competition in the downstream market for turnkey technology platforms.

59.    Sportsbooks are constantly competing with their rivals to provide their users with the best betting experience, and to do this they need to ensure they always have the best technology products, including odds-making software and customer interfaces.

60.    Sportsbooks in the United States typically obtain their sportsbook technology products in one of two ways.

61.    First, the large sportsbooks, such as DraftKings and FanDuel, develop much of their technology in-house. Sportradar sells its official league data rights directly to those sportsbooks, which incorporate the data directly into their own odds-making and other technologies.

---

Claims at ¶ 17, *Sportscastr Inc.* v. *Sportradar Grp., AG,* No. 2:23-CV-00472-JRG (E.D. Tex. 2023), ECF No. 536.

62.     Second, there are the less dominant sportsbooks, which purchase their technology from third-party providers.  Those third-party providers develop the odds-making and other products that are necessary to offer an online sportsbook, and they deliver their "turnkey" technology product to sportsbooks.  These turnkey providers—such as Altenar, Kambi, and Betby—need to purchase the official league data, which they incorporate into their product, from Sportradar.  Without the data, the "turnkey" providers simply do not have a viable offering.

63.     Indeed, many sportsbooks rely on turnkey technology companies like Altenar to provide a total betting package that incorporates live official league data from Sportradar with odds-making software and customer interfaces.  Altenar and other turnkey technology providers use Sportradar's official league data to build their products, including platform software, trading tools, risk management systems, odds compilation engines, and customer interfaces, which they then sell as a package directly to sportsbooks.

64.     Altenar has been a highly successful turnkey technology provider abroad, with over 800 employees, 6 offices, and expertise in the betting product and odds-making market in over 50 countries.  Altenar sells its turnkey technology products to sportsbooks and other sports betting companies all over the world, but not—as of now, given Sportradar's conduct—in the United States.

65.     In 2015, when sports betting was still outlawed in the United States, Altenar initially contracted with Sportradar for the necessary access to Sportradar's exclusive official data rights abroad so Altenar could develop and market its turnkey technology products to sportsbooks.

66.     Altenar dutifully operated under the parties' commercial arrangement and, through marketing its world-class turnkey platform to sportsbooks, was granted "Gold Certified Partner" status by the Sportradar brand.

22

67.     The course of dealing between Sportradar and Altenar abroad has been highly profitable for Sportradar for many years.  Indeed, Sportradar freely negotiated and voluntarily entered the commercial deals with Altenar, presumably to generate a profit.  And Altenar has paid Sportradar considerable sums under the parties' commercial deals.  Over the past several years, Altenar has paid Sportradar over $6 million per year.

68.     In Europe, where Sportradar has been willing to sell its official data rights to turnkey solution providers like Altenar, there has been widespread competition in the turnkey market where no single turnkey provider accounts for more than 30% of turnkey platform installations or total gaming revenue.

69.     When Sportradar sells its data to turnkey providers, those turnkey providers have a chance to compete for sportsbooks' business on the merits of their own product and pricing.  This type of competition lowers prices and spurs innovation, and it is good for sportsbooks and good for consumers.

### *Sportradar's Refusal to Deal Forecloses Altenar from the United States Market*

70.     Since 2015, Sportradar has contracted to provide Altenar with official league data rights abroad.  This longstanding course of dealing has enabled Altenar to be an effective competitor in providing turnkey services to sportsbooks, and the arrangement has also been profitable for Sportradar.

71.     In 2020, Sportradar sought to renegotiate the terms of the parties' original 2015 agreement.

72.     During the negotiation process, and seeing that sports betting was now legal and rapidly growing in the United States, Altenar requested access to Sportradar's official data rights for use in the United States market.

73.     Sportradar pushed for an agreement that expressly excluded the United States but promised Altenar that, if it signed that agreement—which also imposed unreasonable pricing and forced Altenar to purchase products it did not want and would never use—Sportradar would grant Altenar access to the United States rights under a separate commercial deal.   Altenar took Sportradar at its word in light of the parties' longstanding course of dealing, and it signed a new agreement in 2021.

74.     Sportradar has reneged on its promise.   Rather than provide Altenar and other turnkey technology companies with promised data rights for use in the United States—as it has done through its profitable course of dealing for many years abroad—Sportradar has instead decided to enter and attempt to seize as much of the United States turnkey technology market for itself as possible.   Indeed, despite its previous promises, Sportradar now refuses to provide Altenar with access to its data rights necessary to enter the United States turnkey technology market.   This refusal to provide Altenar with a must-have input, which flies in the face of the parties' longstanding course of dealing, has caused Altenar to be excluded from the United States market.[19]

75.     Sportradar has also engaged in increasingly anticompetitive conduct with respect to its dealings with Altenar abroad.   The 2021 contract between the parties is set to expire on March

---

[19] The only limited instance where Altenar has been able to utilize Sportradar data rights in the United States involves Sportzino.   Sportzino is not a licensed sportsbook in the United States; rather, it operates what is commonly referred to as a "sweepstakes."   Altenar previously notified Sportradar that it would service Sportzino under the parties' commercial deal, and Sportradar did not object.   When Sportradar subsequently "learned" what Altenar had already made clear—that Altenar was servicing Sportzino—it demanded that Altenar *"close all operations in the US"* and "immediately cease supplying the Sportradar Services under the Solution to Sportzino in connection with any operations or use in the US territory."   Sportradar, however, was "willing to continue supporting the sportzino.com brand *outside the United States*."   Sportradar eventually acknowledged its vehement objections to servicing Sportzino were untimely given Altenar's prior notice, and it has been forced to allow Altenar to service the unlicensed sweepstakes company through the remainder of the current contract.   Sportradar, however, has made clear that it refuses to provide Altenar with any other rights, such as the right to use Sportradar data in connection with servicing licensed sportsbooks, in the United States.

31, 2026. Sportradar's "offer" to extend the parties' commercial arrangement contained a long list of terms, including heightened pricing and unwanted products, that would have resulted in a loss-making operation for Altenar. Faced between entering a deal that would cause Altenar to operate at a loss, or losing access to Sportradar's critical data rights altogether, Altenar has been forced to file an arbitration against Sportradar in Switzerland. Altenar has also filed an application for interim measures and a complaint with the Maltese Competition Authority.

76. Sportradar's sudden refusal to supply Altenar with official league data after doing so for more than a decade can only be motivated by anticompetitive self-interest. In public filings, Sportradar identifies "potential changes in competitive landscape, *including new market entrants*" as a risk to its business model.[20] Sportradar's refusal to deal with Altenar—and prevent it from entering the United States market—follows Sportradar's heavy investment in *its own competing turnkey products.*

77. Indeed, on June 27, 2022, Sportradar announced its own "all-in-one" turnkey solution for sportsbooks, referred to as ORAKO, placing it in direct competition with Altenar.[21]

78. *Sportradar markets ORAKO as an all-in-one turnkey technology solution, meaning that sportsbooks do not need any other.* Moreover, as Sportradar itself proclaimed, with the arrival of ORAKO, sportsbooks will never need "to invest in additional technology and innovation."[22]

---

[20] *Sportradar Group AG 2024 Annual Report* at 10, Sportradar (Mar. 24, 2025), https://investors.sportradar.com/static-files/346a82eb-7978-4aa9-b462-9c3feea4724a

[21] Press Release, Sportradar, Sportradar's all-in-one ORAKO sportsbook solution to drive higher operational efficiencies for betting operators (June 27, 2022), https://tinyurl.com/2zbpfuy5.

[22] *Id.*

79.    Altenar, meanwhile, has repeatedly sought a commercial deal from Sportradar for data rights, and it has continuously attempted to enter the rapidly growing United States market to compete.  Altenar has a designated professional based in New Jersey dedicated to trying to sell its turnkey solutions in the United States.  Altenar also keeps on retainer an expert on negotiations with tribal casinos in the United States for the same purpose.

80.    In total, Altenar has spent nearly $2 million, attended 19 expos, engaged with 41 companies, and performed 20 "demos" related to potential commercial deals in the United States.  Altenar projects to spend another $750,000 and attend 6 more expos in the United States in 2026.  Due to Altenar's continuous efforts, it has made progress in discussions with multiple sportsbooks in the United States.  Altenar's technology products have received overwhelmingly positive feedback by its potential customers in the United States—just as it has abroad.

81.    Despite Altenar's progress, however, it has not been able to close a commercial deal with a single sportsbook in the United States because it does not have the necessary access to Sportradar's live official league data rights.  In fact, Altenar is consistently losing such deals to Sportradar itself.  These losses, of course, have nothing to do with which company offers a better technology.  By refusing to supply Altenar, Sportradar does not have to compete on the merits of its turnkey product (or on price) at all.

82.    Altenar has attempted to obtain state licensing in New Jersey so that it may sell its turnkey technology products to sportsbooks (and, in turn, contribute to the New Jersey economy through, among other things, employment, licensing fees, and tax payments).  However, New Jersey, like many states, requires Altenar to have a commercial deal already in place with a sportsbook before it can obtain a license.  Without access to Sportradar's data rights, however, Altenar has not been able to close a commercial deal necessary to obtain that license.

26

83.     During commercial negotiations, several sportsbooks have informed Altenar that, although they are unhappy with the technology offerings they are effectively forced to use and would like to utilize Altenar's, they can only use a product that integrates what they variously describe as highest-quality data or official data, which is controlled by Sportradar.  Because Altenar does not have access to Sportradar's data, these potential customers have refused to purchase Altenar's turnkey product.

84.     Indeed, even Altenar's longstanding customers abroad have refused to enter commercial deals with it in the United States despite their prior and positive commercial relationship.  For example, for many years in European markets, Soft2Bet, a company that offers, among other things, a licensed sportsbook to consumers, has utilized Altenar instead of competitors such as Kambi for turnkey technology.  In the United States, however, Soft2Bet has decided to partner with Kambi instead of Altenar, not least because Kambi has access to Sportradar's data and Altenar does not.

85.     Indeed, Altenar is a highly successful competitor abroad where Sportradar historically has supplied it with official league data.  But in the United States, without access to Sportradar's data, Altenar—despite devoting significant expenses and efforts—has been unable to close a single deal.  This demonstrates the importance of Sportradar's data rights in practice.  Without those data rights, Altenar, or any other competitor that Sportradar decides to keep out of the market, has no fair shot at servicing sportsbook customers.

86.     Notably, during this same period, Genius Sports, the company that owns the exclusive rights to NFL official data, has not attempted to cut Altenar's supply off abroad and has never indicated it would refuse rights to prohibit Altenar from entering the United States market.

27

87.    Unfortunately, Altenar's access to Genius Sports's NFL data alone does not allow it to compete in the United States market.  Altenar, and its would-be sportsbook customers, need access to Sportradar's official league data for leagues such as the NBA, MLB, and NHL to be competitive.  Access to official league data for a specific league or competition is not interchangeable with official league data for another league or competition from the perspective of sportsbooks or sportsbook technology providers such as Altenar.  To build competitive sportsbook technology solutions, providers must have access to official league data rights for all major leagues and competitions, the vast majority of which are controlled by Sportradar, or their betting customers will simply move their business to a provider that does.

88.    Unlike Sportradar, Genius Sports is *not* an active competitor of Altenar in the turnkey technology market, demonstrating that when an exclusive data provider is not worried about competing with Altenar, it has no reason to restrict Altenar's access to data.

89.    Altenar meanwhile continues to request data rights from Sportradar for use in the United States market under a separate commercial deal that would be in Sportradar's long-term financial interest.  But, seeking to prohibit competition away from its own technology products, and exclude a significant rival from the market, Sportradar continues to refuse Altenar access to its indispensable official data rights.

### *Sportradar's Actions Have Harmed Competition and Consumers in the United States*

90.    The Sherman Act prohibits anticompetitive conduct that affects competition in the United States.

91.    Sportradar's wielding of its monopoly power over live official league data, an essential component of the sports betting industry, to prevent competition in the turnkey technology market, has harmed competition in the United States.

92.     As previously discussed, in the turnkey markets abroad, where Sportradar historically has been willing to sell its official data rights to turnkey technology providers, there has been widespread competition.

93.     The turnkey market in the United States looks quite different.   Sportradar has provided its data rights to only select companies as it attempts to dominate the turnkey market for itself.  Kambi, one such provider, has at least temporarily benefited from Sportradar's exclusionary conduct.  Without the same widespread healthy competition it faces in the European turnkey market, Kambi has been able to capture a much larger market share in the United States than it has abroad.

94.     Sportsbooks have limited choices in the rapidly growing United States market.  Given how lucrative this market potentially is, one would expect widespread competition.  But Sportradar has prevented that.

95.     Further, during this same period when turnkey competitors should have been competing and innovating to win the business of this billion-dollar market, there was no incentive for either Sportradar or Kambi to innovate or lower prices, because there are far fewer relevant players in the market.  Indeed, when marketing its own turnkey technology, ORAKO, Sportradar proclaims that sportsbooks no longer need to worry about investing in additional technology and innovation.[23]  By refusing to supply Altenar, Sportradar has harmed competition—decreasing customer choice, increasing prices, and stifling innovation—in the market for turnkey services.

96.     Moreover, there is a real chance that Sportradar will become a monopoly in this market.   Sportradar continues to push its ORAKO platform in the United States market.

---

[23] Press Release, Sportradar, Sportradar's all-in-one ORAKO sportsbook solution to drive higher operational efficiencies for betting operators (June 27, 2022), https://tinyurl.com/2zbpfuy5.

29

Sportradar's deal with Kambi is set to expire in the relatively near term, and it is unclear whether Sportradar will continue to allow Kambi or any other turnkey providers to operate in the United States. With its exclusive data rights secured, Sportradar can fully eliminate competition in the turnkey market.

97.    Altenar has attempted to convince Sportradar to let it enter the United States turnkey market several times, but Sportradar has continuously deprived United States consumers of the benefits additional competitors would bring to the market. Altenar's turnkey offering is superior to Sportradar's and, because of Sportradar's anticompetitive refusal to deal, United States customers do not have the choice of using Altenar.

98.    Sportradar has refused to deal with Altenar for rights in the United States, foregoing profits that would result from a commercial deal and disregarding its long-term profitable relationship with Altenar.

99.    Sportradar's refusal to grant Altenar and others access to an indispensable facility—namely MLB, NBA, and NHL official league data rights—departs from competition on the merits, produces exclusionary effects, and lacks objective justification. It is therefore unlawful.

100.    Sportradar's refusal to deal can only be motivated by its plan to monopolize the United States turnkey technology market and eliminate competition for its own products such as ORAKO, and to foreclose Altenar from the United States market so that Sportradar's products would eventually be the only, or nearly the only, ones available to United States sportsbooks.

101.    Sportradar does not compete on the merits of its own technology product but instead forecloses its competitors by denying them access to essential NBA, MLB, and NHL official league data, without which turnkey products are prohibitively unattractive for sportsbooks.

102.    At the same time, Sportradar grants such access to its own sportsbook technology ventures, thereby gaining a competitive advantage not due to the superiority of its products but rather because it can provide sportsbooks with the necessary ability to offer live bets on NBA, MLB, and NHL events.

103.    If Sportradar continues to abuse its position as the exclusive holder of official data rights to prevent competition in the downstream turnkey technology market, then it will be able to continue to charge whatever prices it deems necessary, suppress innovation, reduce customer choice, and generally raise prices and lower quality throughout the United States market.

104.    In sum, Sportradar has used its exclusive control over official league data to forcibly keep Altenar out of the United States market.  Currently, Sportradar is refusing to negotiate with Altenar for access to official data entirely, including in the United States, and foregoing the profitable relationship altogether to avoid facing fair competition.

105.    Sportradar's refusal to deal with Altenar in the United States market is inexplicable absent anticompetitive motivation.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**

***Attempted Monopolization via Refusal to Deal (Sherman Act § 2)***

106.    Altenar repeats and realleges the foregoing paragraphs as if fully set forth herein.

107.    Sportradar has refused to extend its longstanding, voluntary, and profitable course of dealing with Altenar to allow Altenar to enter the United States market during a time in which that market is rapidly growing.

108.    Altenar has repeatedly asked Sportradar to allow it to take advantage of the profitable opportunity that exists for both companies, but Sportradar has continuously refused.

109.    Sportradar has monopoly (or at least market) power in the separate markets for each league's official sports data (or in the alternative market for official sports data as a whole).  It has exclusive control of rights that Altenar needs to offer a competitive product to sportsbooks in the downstream market for turnkey technology.

110.    Sportradar's refusal to supply essential official data, despite the massive opportunity available for both companies, constitutes exclusionary conduct without legitimate business justification, undertaken to exclude a rival, foreclose and destroy competition, and extend market power into the downstream or adjacent turnkey technology market.

111.    Sportradar's conduct has caused antitrust injury to competition and Altenar, resulting in, among other things, higher prices and lower quality products throughout the United States during the entire period in which it has refused to allow Altenar to enter the market, which has caused Altenar to lose profits it otherwise would have earned in a competitive market.

112.    Sportradar's refusal-to-deal scheme violates Section 2 of the Sherman Act and has caused antitrust injury to Altenar and the market at large.

113.    Altenar seeks injunctive relief to stop Sportradar's anti-competitive refusal to deal, an order that Sportradar supply Altenar on reasonable terms, and damages as permitted by law, as well as such other relief as necessary to undo the effects of Sportradar's exclusionary conduct.

## COUNT II

### *Attempted Monopolization via Denial of Essential Facilities (Sherman Act § 2)*

114.    Altenar realleges the foregoing paragraphs as if fully set forth herein.

115.    Sportradar has a monopoly over and controls facilities essential to effective competition in the turnkey technology market: live official league data that is practically and

economically infeasible for a rival to duplicate within a reasonable time due to, among other things, exclusive contracts between major sports leagues and Sportradar.

116.    Altenar has repeatedly sought reasonable, non-discriminatory access to those facilities and is willing to pay commercially reasonable prices and abide by integrity and security requirements, but Sportradar has denied such access absent Altenar's agreement to remain out of the United States market and purchase other products unrelated to the technical supply of data.

117.    It is feasible, and indeed profitable, for Sportradar to provide Altenar the essential facilities, as evidenced by, among other things, prior supply arrangements and standard industry practices.

118.    Sportradar's refusal is not justified by legitimate business needs and is intended to destroy competition, exclude a rival, and position itself as the exclusive or near exclusive provider of technology solutions in the United States market.

119.    By denying Altenar reasonable access to essential facilities, Sportradar has foreclosed effective competition, raised rivals' costs, and preserved its monopoly, in violation of Section 2.  Altenar suffered and continues to suffer antitrust injury as a direct and proximate result.

120.    Sportradar's scheme violates Section 2 of the Sherman Act and has caused antitrust injury to Altenar and the market at large.

121.    Altenar seeks injunctive relief to stop Sportradar's anticompetitive refusal to deal, an order that Sportradar supply Altenar on reasonable terms, and damages as permitted by law, as well as such other relief as necessary to undo the effects of Sportradar's exclusionary conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Altenar respectfully requests that the Court:

a.  Declare Sportradar's refusal to deal with Altenar for rights in the United States to constitute a violation of antitrust laws;

b.  Enjoin Sportradar from refusing to deal with Altenar with respect to official league data on reasonable and non-discriminatory terms, including an order requiring supply under reasonable terms and consistent with past voluntary dealings and industry norms;

c.  Award Altenar treble damages in an amount to be determined at trial, together with costs and reasonable attorneys' fees under 15 U.S.C. § 15;

d.  Grant preliminary and permanent injunctive relief as necessary to restore competition and enable Altenar to compete effectively in the United States market under 15 U.S.C. § 26; and

e.  Grant Altenar such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Altenar demands a trial by jury on all issues so triable.

Dated: March 31, 2026

By: /s/ Ivan Torres
Ivan Torres
itorres@cahill.com
Edward N. Moss (pro hac forthcoming)
emoss@cahill.com
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, N.Y. 10005

*Attorneys for Plaintiff*